KRASS v TRI-COUNTY SECURITY, INC

Docket No. 204413. Submitted December 10, 1998, at Detroit. Decided February 2, 1999, at 9:25 A.M.

Dennis M. Krass, as personal representative of the estate of Steven G. Krass, deceased, brought an action in the Wayne Circuit Court against Tri-County Security, Inc., Baldini, Inc., and others, alleging that the plaintiff's decedent, after attending a concert at a theater owned by Baldini, was shot and killed by three assailants at a parking lot as a result of the negligence of Tri-County in providing parking lot security pursuant to a contract between Tri-County and Baldini. The court, Kaye Tertzag, J., granted summary disposition for Tri-County, ruling that Tri-County owed no actionable duty to the decedent. The plaintiff appealed.

The Court of Appeals *held*:

1. The decedent was not a third-party beneficiary of the contract between Tri-County and Baldini. Pursuant to MCL 600.1405(1); MSA 27A.1405(1), a promise will be construed to have been made for the benefit of a person when the promisor undertook to give or to do or refrain from doing something directly to or for that person. The contract in this case contained no provision relating to the safety of Baldini patrons or employees or anyone else and therefore did not provide for something to be done directly to or for the decedent.

2. Merchants ordinarily are not responsible for the criminal acts of third parties. A merchant, or a security firm hired by the merchant, who voluntarily takes safety precautions against crime cannot be sued on the theory that the safety precautions were less effective than they could have been or should have been. The duty advanced by the plaintiff is essentially one of police protection, which duty is vested in the government by constitution and statute. The inability of government and law enforcement officials to prevent criminal attacks does not justify transferring the responsibility to a business owner or, derivatively, to a security firm hired by the business owner.

Affirmed.

1. CONTRACTS — THIRD-PARTY BENEFICIARIES.

  A third-party beneficiary of a contract is one for whom a party to the contract has undertaken to give or to do or refrain from doing something directly to or for that person (MCL 600.1405[1]; MSA 27A.1405[1]).

2. NEGLIGENCE — BUSINESS INVITEES — SECURITY.

  Merchants ordinarily are not responsible for the criminal acts of third parties; where a merchant or a security firm hired by the merchant voluntarily takes safety precautions, an action may not be maintained on the theory that safety measures are less effective than they could have been or should have been.

*Paskin, Nagi & Baxter, P.C.* (by *David R. Baxter* and *Daniel J. Seymour*), for Dennis M. Krass.

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton* (by *Janet C. Barnes*), for Tri-County Security, Inc.

Before: HOLBROOK, JR., P.J., and O'CONNELL and WHITBECK, JJ.

WHITBECK, J. Plaintiff, Dennis M. Krass, personal representative of the estate of Steven G. Krass, deceased, appeals as of right an order granting summary disposition in favor of defendant Tri-County Security, Inc., pursuant to MCR 2.116(C)(10). The basic issue is whether a merchant (and, derivatively, the security company that it hires) that takes security precautions by hiring the security company to provide parking lot patrol and serve as a deterrent to crime can be sued on the theory that the safety precautions were less effective than they could have been or should have been. We hold that as a matter of law such a suit is precluded and affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

On January 13, 1996, a security guard from Tri-County directed plaintiff's decedent Steven G. Krass,

to park his car in a parking lot owned by defendant Joliet, Inc., doing business as Harper Food Center. Steven G. Krass was attending a concert at Harpo's Concert Theatre, which was owned by defendant Baldini, Inc. Tri-County provided security guard services, pursuant to a July 22, 1994, contract with Baldini, Inc.[1] The contract, under the heading of "Specific Duties," stated the following: "Parking Lot Patrol Deterrant (sic) to Crime in parking lots." Attached to the contract, and presumably incorporated therein, was a printed set of terms and conditions. Of direct relevance is Paragraph 9 of these terms and conditions, which stated:

> The Client (Baldini, Inc.) understands and agrees that the Security Officers provided by the Company (Tri-County) under this agreement are only a deterrant (sic) to crime, fire and vandalism and that the Company does not claim or guarantee that security may not be circumvented or compromised; that the officer(s) will prevent any and all loss from burglary, hold-up, vandalism, larceny, fire or otherwise. The Company is not itself an insurer. The Client assumes all risk for loss or damage to Client's premises and contents and will maintain his/her own insurance coverage thereon. Client property shall at no time be deemed in the care, custody or control of the Company. The amounts payable to the Company are not sufficient to warrant the Company assuming any risk of consequental (sic) or any other damages which are sustained through burglary, hold-up, fire, larceny, vandalism or any other cause or liability by virtue of this Agreement, or because of the relationship because of negligence or otherwise. . . .

---

[1] The contract listed the business name of Baldini, Inc., as "Harpo's Concert Theater" and the address as "14238 Harper." This is not the address of the parking lot to which the security guard directed Steven G. Krass. Rather, the parking lot to which he was directed was owned by defendant Joliet, Inc., doing business as Harper Food Center.

Steven G. Krass returned to his car in the early morning of January 14, 1996, and was assaulted by three men. Steven G. Krass was shot in the head and died of that gunshot wound on January 17, 1996. Thereafter, plaintiff brought suit, alleging, among other things, that Tri-County failed to properly protect Steven G. Krass or to control the premises. Plaintiff also alleged that at no time before, during, or after the assault did Tri-County's security guard try to evict, warn, signal, or communicate his presence to the unknown assailants and failed to take any affirmative steps to protect Steven G. Krass from harm. Plaintiff further alleged that, as a result of Tri-County's negligence, Steven G. Krass sustained the injuries that caused his death. The trial court granted Tri-County's motion for summary disposition, finding that Tri-County owed no duty to Steven G. Krass to protect him from the criminal acts of third parties and that he was not a third-party beneficiary of the contract. Plaintiff thereafter brought this appeal.[2]

## II. STANDARD OF REVIEW

Tri-County brought its motion pursuant to MCR 2.116(C)(8) and (C)(10). Where the record is unclear

---

[2] Plaintiff states in his brief that he is also appealing a trial court order that granted summary disposition to defendant Baldini, Inc. However, plaintiff goes on to state:

> Since the filing of this appeal, Plaintiff has been informed that Defendant/Appellee Baldini, Inc. has sought protection under the bankruptcy laws of the United States. Pursuant to 11 USC § 362 the continuation of this litigation against Baldini has thereby been stayed. Plaintiff is not waiving any rights against Baldini and is simply precluded from asserting its appeal at this time against Baldini because of the overriding bankruptcy statute.

We therefore consider the appeal only as it relates to Tri-County.

with regard to which section of MCR 2.116 the trial court based its ruling, and both the defendant and the trial court relied on documentary evidence beyond the pleadings in support of the defendant's motion for summary disposition, this Court must construe the defendant's motion as being granted pursuant to MCR 2.116(C)(10). *Osman v Summer Green Lawn Care, Inc*, 209 Mich App 703, 705; 532 NW2d 186 (1995). This Court reviews the trial court's grant of summary disposition de novo. *Pinckney Community Schools v Continental Casualty Co*, 213 Mich App 521, 525; 540 NW2d 748 (1995). This Court must review the trial court record to determine if the movant was entitled to judgment as a matter of law. *Phillips v Deihm*, 213 Mich App 389, 398; 541 NW2d 566 (1995). All reasonable inferences are to be drawn in favor of the nonmoving party. *Paul v Lee*, 455 Mich 204, 210; 568 NW2d 510 (1997).

### III. THIRD-PARTY BENEFICIARY

Plaintiff argues that Steven G. Krass was a third-party beneficiary of the contract between Tri-County and Baldini, Inc. We can dispose of this argument summarily. "For a plaintiff to sue on a contract to which he is not a party, it must be determined that the plaintiff was an intended third-party beneficiary of the contract which suit is brought on." *Rhodes v United Jewish Charities of Detroit*, 184 Mich App 740, 744; 459 NW2d 44 (1990). Pursuant to MCL 600.1405(1); MSA 27A.1405(1), a promise will be construed to have been made for the benefit of a person when the promisor undertook to give or to do or refrain from doing something directly to or for that person. An objective standard must be used by the

court in determining the plaintiff's status. *Rhodes, supra* at 744. "The contract itself reveals the party's intentions." *Id.* As noted above, the contract stated: "Parking Lot Patrol Deterrant (sic) to Crime in parking lots." There was no provision in this contract relating to the safety of patrons, employees, or anyone else. Steven G. Krass was not a third-party beneficiary because the contract did not provide for something to be done directly to or for him, or any other patron. The case cited by plaintiff in the reply brief, *Koenig v South Haven*, 221 Mich App 711; 562 NW2d 509 (1997), does not persuade us to the contrary.

### IV. DUTY

#### A. INTRODUCTION

Plaintiff argues that the trial court erred in granting summary disposition because plaintiff submitted documentary evidence that demonstrated a genuine issue of material fact regarding whether Tri-County's security guard was negligent. We disagree and we note, as outlined more fully below, that in making this argument plaintiff elides the initial question whether a duty existed as a matter of law. "The issue of duty is one of law for the court, which must assess competing policy considerations to determine whether the relationship between the parties will occasion a legal obligation to the injured party." *Tame v A L Damman Co*, 177 Mich App 453, 455; 442 NW2d 679 (1989), citing *Madley v Evening News Ass'n*, 167 Mich App 338, 341; 421 NW2d 682 (1988).

#### B. THE GEOGRAPHIC EXTENT OF DUTY

This case presents an interesting factual anomaly that, fortunately, is unnecessary for us to decide. Tri-

County notes that the Harper Food Center parking lot to which the security guard directed Steven G. Krass was not owned by Baldini, Inc., and, therefore, the premises in which he was assaulted and killed were arguably not covered by the contract.[3] Plaintiff, however, points out that there is deposition testimony to the effect that Baldini, Inc., actually owned *no* parking lots. Therefore, plaintiff argues, Baldini, Inc., depended on its customers parking in lots owned by others. There is conflicting deposition testimony regarding whether Baldini, Inc., ever directed Tri-County to patrol or place guards at or in the Harper Food Center parking lot and whether Tri-County ever actually patrolled or placed guards at or in that parking lot. Nevertheless, it is clear that Tri-County's security guard directed Steven G. Krass to the Harper Food Center parking lot. We therefore assume without deciding that, viewing the facts in a light most favorable to plaintiff,[4] Baldini, Inc., and its agent Tri-County had possession and control of the Harper Food Center parking lot, at least to the extent that Steven G. Krass was directed to park there. Because we decide the case on other grounds, we do not need to consider the geographic extent of any duty.

C. A PRIMA FACIE CASE OF NEGLIGENCE AND THE GENERAL CONCEPT OF DUTY

To establish a prima facie case of negligence, the plaintiff must prove: (1) that the defendant owed a

---

[3] Indeed, the terms and conditions of the contract, as noted above, provide that the client's property is not to be deemed in the care, custody, or control of Tri-County.

[4] A court reviewing a motion under MCR 2.116(C)(10) must consider the pleadings, affidavits, depositions, admissions, and any other documentary evidence in favor of the party opposing the motion. *Radtke v Everett*, 442 Mich 368, 374; 501 NW2d 155 (1993).

duty to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach of duty was a proximate cause of the plaintiff's damages; and (4) that the plaintiff suffered damages. *Babula v Robertson*, 212 Mich App 45, 48; 536 NW2d 834 (1995).

Despite plaintiff's emphasis on the alleged negligence of Tri-County's security guard, this case essentially revolves around the *existence* of a duty, rather than whether Tri-County negligently performed any such duty, if it existed. Generally, duty is any obligation that the defendant has to the plaintiff to avoid negligent conduct. *Simko v Blake*, 448 Mich 648, 655; 532 NW2d 842 (1995). As a general rule, there is no legal duty that obligates one person to aid or protect another. 2 Restatement Torts, 2d, § 314, p 116; *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498-499; 418 NW2d 381 (1988); *Johnson v Bobbie's Party Store*, 189 Mich App 652, 660; 473 NW2d 796 (1991). "Generally, there is no duty to protect another from the criminal acts of a third party in the absence of special circumstances." *Tame, supra* at 455-456, citing *Madley, supra* at 341-342.[5]

The question of duty turns on the relationship existing between the actor and the injured person. *Moning v Alfono*, 400 Mich 425, 438-439; 254 NW2d 759 (1977). In determining whether a duty exists, courts look to different variables, including: foreseeability of the harm, existence of a relationship

---

[5] We are aware that, as plaintiff points out, *Tame* also states:

We do not intend, however, to preclude claims of negligent supervision or vicarious liability for negligence on the part of security guard services. The facts of this case, however, do not support such a claim. [*Tame, supra* at 457.]

between the parties involved, degree of certainty of injury, closeness of connection between the conduct and the injury, moral blame attached to the conduct, policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach. *Buczkowski v McKay*, 441 Mich 96, 100-101 & n 4; 490 NW2d 330 (1992); *Babula, supra* at 49. See also *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 203; 544 NW2d 727 (1996). As the Court noted in *Buczkowski, supra* at 100:

> For purposes of this case we distinguish between duty as the problem of the relational obligation between the plaintiff and the defendant, and the standard of care that in negligence cases is always reasonable conduct. Thus, the duty to use "reasonable care" is the standard for liability rather than the antecedent conclusion that a particular plaintiff has protection against a particular defendant's conduct, or that a particular defendant owes any specific duty to a particular plaintiff. Duty is actually a " 'question of whether the defendant is under any obligation for the benefit of the particular plaintiff' and concerns 'the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other.' " *Friedman v Dozorc*, 412 Mich 1, 22; 312 NW2d 585 (1981); Prosser & Keeton, Torts (5th ed), § 53, p 356. " 'Duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id.*, p 358. See also *Friedman v Dozorc, supra,* and *Antcliff v State Employees Credit Union,* 414 Mich 624, 631; 327 NW2d 814 (1982).

### D. MISFEASANCE VERSUS NONFEASANCE AND THE SPECIAL RELATIONSHIP EXCEPTION

As the Michigan Supreme Court stated in *Williams, supra* at 498-499:

In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm. The common law has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff. Thus, as a general rule, there is no duty that obligates one person to aid or protect another.

Here, there is no question that Tri-County's security guard did not engage in active misconduct. Thus, we are confronted with allegations of nonfeasance rather than misfeasance. As the Court in *Williams* noted, however, there are court-recognized exceptions to the general rule of nonliability that apply in circumstances where a "special relationship" exists between a plaintiff and a defendant. *Id.* at 499. Examples include a common carrier that may be obligated to protect passengers,[6] an innkeeper who may be obligated to protect guests[7], and an employer who may be obligated to protect employees.[8] As the Court explained in *Williams, supra* at 499:

The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety.

---

[6] See, e.g., *Frederick v Detroit*, 370 Mich 425; 121 NW2d 918 (1963).

[7] See, e.g., *Keech v Clements*, 303 Mich 69; 5 NW2d 570 (1942).

[8] See, e.g., *Bradley v Stevens*, 329 Mich 556; 46 NW2d 382 (1951).

The Court went on to note that the largest group on whom an affirmative duty to protect is imposed is comprised of individuals or entities who are owners and occupiers of land. *Id.* The Court stated:

> The possessor of land has a duty to exercise reasonable care to protect invitees from an unreasonable risk of harm caused by a dangerous condition of the land. Consequently, a landlord may be held liable for an unreasonable risk of harm caused by a dangerous condition in the areas of common use retained in his control such as lobbies, hallways, stairways, and elevators. Likewise, a business invitor or merchant may be held liable for injuries resulting from negligent maintenance of the premises or defects in the physical structure of the building.
>
> The duty a possessor of land owes his invitees is not absolute, however. It does not extend to conditions from which an unreasonable risk cannot be anticipated or to dangers so obvious and apparent that an invitee may be expected to discover them himself. Furthermore, "the occupier is not an insurer of the safety of invitees, and his duty is only to exercise reasonable care for their protection."[9] [*Id.* at 499-500.]

Here, therefore, it is possible that a duty may have run from Baldini, Inc., to Steven G. Krass, on the

---

[9] In support of this proposition, the Court cited Prosser & Keeton, Torts (5th ed), § 61, p 425 and *Kroll v Katz*, 374 Mich 364, 372-373; 132 NW2d 27 (1965). In *Kroll*, the plaintiff sued for injuries sustained when, at the direction of his employer, he entered a vacant house to make plumbing repairs that had been requested by the defendant, whom the trial court found was the vendor of the house under a defaulted land contract, during the period of redemption, and was therefore in control and possession of the premises. *Id.* at 366-368. The trial court also held the plaintiff to be an invitee of the defendant. *Id.* at 367. While also citing Prosser [Prosser on Torts (2d ed), p 459] to the effect that an occupier of land is not an insurer of the safety of invitees, the Court held that a jury could have found that the defendant knew, or should have known, of the dangerous condition of the premises and, in the exercise of reasonable care, should have either remedied the danger or warned the plaintiff of its existence. *Id.* at 373-374.

basis of his "special relationship" to Baldini, Inc., as a business invitee, but the existence of this duty must be analyzed within the parameters of *Williams* and related cases that define duty to business invitees. We wish to emphasize, moreover, that this special relationship, if it existed at all, existed between Baldini, Inc., and Steven G. Krass; there is no legal relationship whatever between Steven G. Krass and Tri-County.[10] Any legal connection between Steven G. Krass and Tri-County derives from the contract between Baldini, Inc., and Tri-County. Simply put, therefore, if Baldini, Inc., owed no duty to Steven G. Krass as its business invitee, then neither, on a derivative basis, did Tri-County.

---

[10] Our reading of the complaint leads us to conclude that plaintiff did not allege an independent common-law duty owed to Steven G. Krass by Tri-County. In any event, we do not believe such a claim to have been viable in the circumstances of this case. See *Roberts v Pinkins*, 171 Mich App 648, 654; 430 NW2d 808 (1988) (although the foreseeability of certain criminal acts by third persons has created a legal duty to some persons even absent a recognized special relationship, the use of the building in question by the plaintiff's attacker was not foreseeable). Contrast *Tucker v Sandlin*, 126 Mich App 701, 705; 337 NW2d 637 (1983) (security guard in question [1] had actual notice of a life-threatening assault that apparently preceded the assault on the plaintiff, [2] promised the victim of the first assault that he would "take care" of the task of informing police of the assailant's presence, thereby undertaking a duty to all users of the ramp that he would do so, and [3] failed to immediately notify police, an omission that expert testimony indicated was a breach of the standard of care applicable to a security guard). We do recognize, however, that in plaintiff's reply brief, he appeared to assert a claim of negligence against Tri-County, stating, "In the instant case, Plaintiff both pled and produced facts to the trial court which established security guard negligence by failing to remain visible, being derelict and de facto abandoning the guard's post in the parking lot, all in breach of the contract between the security guard company and the merchant." The last clause in this sentence reveals the flaw in plaintiff's argument: plaintiff is clearly asserting that the duty which it claims Tri-County negligently performed *derived* from the contract between Baldini, Inc., and Tri-County.

### E. VOLUNTARY ASSUMPTION OF DUTY

Plaintiff attempts to avoid the effect of *Williams* by asserting that, through its contract with Baldini, Inc., Tri-County "assumed" the responsibility to provide security for the parking lots in question. In making this argument, plaintiff relies heavily on the language in the contract that states: "Parking Lot Patrol Deterrant (sic) to Crime in parking lots." The reason for plaintiff's aversion to *Williams* is readily apparent from the central holdings in that case: (1) the duty advanced by the plaintiffs was essentially one of police protection but that duty is vested in the government by constitution and statute, *Williams, supra* at 501; (2) although a property owner can control the condition of its premises by correcting physical defects that may result in injuries to its invitees, it cannot control the incidence of crime in the community, *id.* at 502; (3) even if a merchant were not required to prevent all crime, defining a reasonable standard of care short of that goal might well be impossible, *id.* at 503; and (4) the inability of government and law enforcement officials to prevent criminal attacks does not justify transferring the responsibility to a business owner, *id.*

Plaintiff does not cite, or even refer to, *Williams* in his brief. Presumably, however, plaintiff would argue *Williams* involves a situation in which the defendant failed entirely to provide a security guard on the day when the plaintiff was shot by an armed robber on the defendant's premises. Here, plaintiff presumably would argue, Baldini, Inc., and Tri-County voluntarily entered into a contract that obligated Tri-County to provide parking lot patrol and serve as a deterrent to crime. Indeed, plaintiff here relies heavily on *Rhodes, supra,* for the proposition that when a person volun-

tarily assumes the performance of a duty, that person is required to perform it carefully, not omitting to do what an ordinarily prudent person would do in accomplishing the task.

*Rhodes* involved a situation where the plaintiff was assaulted in a fenced and guarded parking lot owned by the defendant United Jewish Charities of Detroit (UJC). UJC also owned the building east of the parking lot and leased space in that building to the defendant Jewish Vocational Services and Community Workshop (JVS) and to Michigan Rehabilitation Services, the plaintiff's employer. By its lease agreement, UJC required JVS to provide guard service for the parking lot. JVS in turn contracted with the defendant Guardian Guard Services to provide on-site security. *Rhodes, supra* at 741-742. The *Rhodes* Court held:

> [W]hen UJC and JVS voluntarily assumed the duty of providing police protection in the form of guards from Guardian, it became incumbent upon them to provide that protection in a non-negligent manner. The question whether the guard was negligent in the performance of his duties is a question for the jury. The grant of summary disposition was therefore erroneous. [*Id.* at 743.]

There are three problems with plaintiff's reliance on *Rhodes*. First, the *Rhodes* Court provided little information about the language contained in the contract between JVS and Guardian, stating only that Guardian was to provide "on-site security" and then categorizing this as a duty to provide "police protection in the form of guards from Guardian." *Id.* at 741-743. Here, by contrast, we have the language in the contract between Baldini, Inc., and Tri-County that obligated Tri-County to provide parking lot patrol and serve as a deterrent to crime. In our view, this con-

tractual obligation falls considerably short of providing "police protection," particularly when considered in light of the language in the terms and conditions of the contract that Tri-County did not claim or guarantee that security might not be circumvented or compromised, that Tri-County did not claim or guarantee that its officer(s) would prevent any loss from burglary, holdup, vandalism, larceny, fire or otherwise and that Tri-County was not itself an insurer.

Second, the *Rhodes* Court relied on *Sponkowski v Ingham Co Rd Comm*, 152 Mich App 123; 393 NW2d 579 (1986), when articulating its voluntary assumption of duty theory. *Rhodes, supra* at 743. *Sponkowski* involved a plaintiff who died as a result of injuries she received when the car in which she was riding followed a vehicle driven by the defendant Charles Wood, ultimately sideswiped the Wood vehicle, and then continued forward until it struck a tree. *Sponkowski, supra* at 125-126. The *Sponkowski* Court described the circumstances as follows:

> Lorrie Sponkowski was a passenger in defendant Cindy Osmon's car, which was one of the cars in the caravan [that was proceeding to stables in Mason, Michigan]. The Osmon vehicle directly followed the car driven by defendant Charles Wood. Osmon indicated in her deposition that she did not know the way to the stables and thus needed to follow another vehicle. From the agreement reached between the participants before leaving, it is apparent that Charles Wood realized that he would be followed. [*Id.*]

These factual circumstances implicitly impose several limitations on the reach of *Rhodes*. We note that *Sponkowski* deals with motor vehicles and that "Michigan law imposes on all motorists a general duty to operate their vehicles in a reasonably prudent man-

ner." *Sponkowski, supra* at 128, citing *Zarzecki v Hatch*, 347 Mich 138, 141; 79 NW2d 605 (1956). Further, in *Sponkowski* defendant Wood voluntarily assumed to lead the other vehicles to an unfamiliar destination; the "agreement" was directly between the parties involved, with a recognition by the party assuming the obligation that he was doing so. This is a far cry from a situation in which two parties agree that one of them will provide parking lot patrol and serve as a deterrent to crime without any general reference to third parties or the public and with no specific reference to patrons, such as Steven G. Krass, of Baldini, Inc., and Harpo's Concert Theatre. Thus, the analogy between Lorrie Sponkowski and Steven G. Krass is, at best, a very distant one.

The third problem with *Rhodes* is the decision in *Scott v Harper Recreation, Inc*, 444 Mich 441; 506 NW2d 857 (1993). In a complaint strikingly similar to the one in this case, the plaintiff in *Scott* alleged that the defendant breached its duty to the plaintiff by failing to provide adequate security to make the parking lot safe, failing to implement adequate security procedures to keep the lot free of criminal activity, and allowing an armed assailant to be present in its parking lot without any attempts being made by security personnel to prevent, or warn of, said assault. *Id.* at 443-444. The Michigan Supreme Court succinctly dissected this claim:

> But the defendant did not advertise that it would "make the parking lot safe" or provide a "lot free of criminal activity"—it never claimed the ability or the intention to create an environment that was guaranteed to be free of crime. The defendant instead advertised specific security measures designed (a) to decrease the likelihood of crime, and (b)

correspondingly to decrease the anxiety felt by patrons. Indeed, because the defendant put in place each promised security measure, it is reasonable to assume that the defendant *did* reduce the incidence of crime in its parking area.

Common sense is required in approaching a case like this. A promise to take specific steps to reduce danger is a promise to do just that—not a promise to eliminate the danger. Manufacturers of safety equipment, for instance, normally promise, expressly or by implication, that the danger of injury will be *reduced*—rarely, if ever, do they promise that all danger of injury will be eliminated. Likewise, neither this defendant's advertising nor the measures it put in place constituted a guarantee of the plaintiff's personal safety. [*Id.* at 450-451 (emphasis in the original).]

The Court then went on to deal with the voluntary assumption of duty theory:

Thus we agree with the analysis offered in *Tame* [*supra*], upon which the circuit court relied in granting summary disposition. In *Tame*, the Court of Appeals "decline[d] to adopt a policy that imposes liability on a merchant who, in a good faith effort to deter crime, fails to prevent all criminal activity on its premises." It said that "[s]uch a policy would penalize merchants who provide some measure of protection, as opposed to merchants who take no such measures." 177 Mich App 457.

The Court of Appeals returned to this area in *Rhodes* [*supra*]. The Court held that a party voluntarily undertaking to provide protection must do so in a nonnegligent manner, and said that the question in *Rhodes*, whether a guard was negligent in the performance of his duties, was a question for the jury. However, *Rhodes* is silent regarding the manner in which the guard was alleged to have been negligent. To the extent that *Rhodes* implies that an agreement to provide security is an actionable warranty that the guarded area will be safe from all criminal activity, it is inconsistent with Michigan law.

The central holding of *Williams* is that merchants are ordinarily not responsible for the criminal acts of third persons. The present suit is an attempt to circumvent that holding by invoking the principle that a person can be held liable for improperly discharging a voluntarily undertaken function. *However, the rule of* Williams *remains in force, even where a merchant voluntarily takes safety precautions. Suit may not be maintained on the theory that the safety measures are less effective than they could or should have been.* [*Scott, supra* at 451-452 (emphasis supplied).]

This Court had the opportunity to evaluate *Rhodes* in light of the decision in *Scott*. In *Abner v Oakland Mall, Ltd*, 209 Mich App 490; 531 NW2d 726 (1995), we upheld the trial court's grant of summary disposition under MCR 2.116(C)(10) in a case where the plaintiff, who was raped by an unknown assailant in the rear parking lot of the Oakland Square shopping center, alleged that the defendants, one of whom had contracted with a codefendant to provide security services at the shopping center, were negligent in failing to ensure that the premises were reasonably safe. The plaintiff relied on this Court's decisions in *Scott v Harper Recreation, Inc*, 192 Mich App 137; 480 NW2d 270 (1991), which was reversed in *Scott, supra*, and in *Rhodes, supra*. *Id*. at 492. The *Abner* Court repeated the Supreme Court's observation that to the extent that *Rhodes* implied that an agreement to provide security is an actionable warranty that the guarded area will be safe from all criminal activity, it is inconsistent with Michigan law. *Id*. at 492-493. However, as with the Supreme Court in *Scott*, the *Abner* Court adopted the central holding in *Williams* that merchants are ordinarily not responsible for the

criminal acts of third persons. *Id.* at 493.[11] The *Abner*
Court went on to find that the essence of the plain-
tiff's claims was that safety measures voluntarily
undertaken by the defendants were less effective than
they could or should have been and that the Supreme

---

[11] In this regard, see also *Douglas v Elba, Inc,* 184 Mich App 160; 457
NW2d 117 (1990). Fascinatingly, *Douglas* involved a "Harpo's Bar" in
Detroit, *id.* at 161, which we presume may be the same establishment as
was involved in this case. The plaintiff was sexually assaulted in a parking
lot near Harpo's. *Id.* Harpo's was owned by the defendant Elba, Inc.,
which had contracted with the defendant Jabar Security Detective
Agency, Inc., to provide outside security for its patrons. *Id.* One of the
plaintiff's claims was that Jabar's duty to protect her derived from Elba's
duty to protect its business invitees because of the contract between
Jabar and Elba, *id.* at 162-163. As is readily apparent, therefore, the plain-
tiff's theory in *Douglas* almost exactly parallels the essence of plaintiff's
theory in this case. The *Douglas* Court relied heavily on *Williams* to
affirm the summary disposition granted to the defendants. The *Douglas*
Court noted, citing *Read v Meijer, Inc,* 178 Mich App 624, 626-627; 444
NW2d 151 (1989), *Tame, supra,* and *Jones v Williams,* 160 Mich App 681,
686; 408 NW2d 426 (1987), that this Court has consistently affirmed the
dismissal of claims against business proprietors for injuries sustained by
invitees from acts committed by third-party criminal actors. The *Douglas*
Court held:

> In this case, the assault occurred in a lot near Harpo's Bar.
> Although a significant portion of Harpo's patrons parked their cars
> in the lot, we adopt the *Jones* reasoning and decline to impose lia-
> bility for failing to provide security for an area over which defend-
> ant Elba had no control. As the Court in *Jones* stated, even if
> defendant Elba was the sole owner of the parking lot, ownership
> alone would not create a duty to provide security. *Id.* at 685. This is
> not a case where defendant Jabar was in a position to control
> Georges' [the assailant's] actions or to eject him from the parking
> lot. See *Mills v White Castle System, Inc,* 167 Mich App 202, 203-
> 204; 421 NW2d 631 (1988), lv den 431 Mich 880 (1988). Nor is this
> a case where defendant Jabar failed to utilize methods at its dispo-
> sal to inform the police of the sexual assault or to attempt to
> frighten off the attacker. See *Diomedi v Total Petroleum, Inc,* 181
> Mich App 789; 450 NW2d 91 (1989). *Because defendant Elba owed
> no duty to plaintiff, defendant Jabar did not derive a duty to
> plaintiff on the basis of the contract.* [*Douglas, supra* at 164-165
> (emphasis supplied).]

Court's decision in *Scott* clearly precludes recovery under such a theory. *Id.* at 493.

We believe this analysis to be exactly correct. While it is debatable whether *Rhodes* actually implied that an agreement to provide security is an actionable warranty that the guarded area will be safe from all criminal activity, that was not the issue in *Williams*, nor in *Scott*, nor in this case. The issue is whether a merchant (and, here, derivatively, the security company that it hires) who voluntarily takes safety precautions against the general societal problem of crime (here, by hiring the security company to provide parking lot patrol and serve as a deterrent to crime) can be sued on the theory that the safety precautions were less effective than they could or should have been. Under *Williams* and *Scott*, we hold that the answer clearly must be no.[12]

We are aware of this Court's recently released decision in *MacDonald v PKT, Inc*, 233 Mich App 395; ___ NW2d ___ (1999), but do not regard that case as requiring a different result. In *MacDonald*, the plaintiff attended the "PlanetFest" concert at the pertinent defendant's outdoor amphitheater where she sat in "general seating" on a lawn-covered hill. *Id.* at 397. While one band was performing, some people on the

---

[12] Plaintiff also relies on *Holland v Liedel*, 197 Mich App 60, 65; 494 NW2d 772 (1992). *Holland* relies on this Court's decisions in *Scott v Harper Recreation, Inc*, 192 Mich App 137, 142; 480 NW2d 270 (1991), rev'd *Scott*, *supra*, and in *Rhodes*, *supra*, for its conclusion that where a defendant "voluntarily assumed the duty to provide security, a cause of action could exist if he was [sic] negligent in the discharge of this voluntarily assumed duty." *Holland*, *supra* at 64-65. Obviously, this Court's decision in *Scott* is no longer good law and, as we have observed above, there are inherent and implicit limitations on the holding in *Rhodes*. In any event, we are not persuaded that *Holland* provides a basis for departing from the holdings of the Supreme Court in *Williams* and *Scott*.

hill began pulling up sod and throwing it at other people, but this terminated after the band stopped performing and an announcement that the activity must stop. Also, several people involved in the incident were ejected from the site. *Id.* There had been two "sod-throwing incidents" at the site in previous years. *Id.* According to the Court, the following ensued:

> Approximately forty-five minutes later, while a different band was performing, the sod throwing began again. When the band refused to make an announcement or to stop performing until the sod throwing stopped, the event coordinator made an announcement demanding that the sod throwing stop. When the sod throwing continued, the band made an additional announcement. Numerous individuals involved in the incident were ejected from the theater. However, plaintiff fractured her ankle when she fell in an attempt to avoid a large piece of sod thrown in her direction. [*Id.* at 397-398.]

The plaintiff in *MacDonald* sued the defendant, alleging in part that it failed to provide proper security. *Id.* The trial court granted summary disposition in favor of the defendant on the ground that it had no duty to protect the plaintiff from the criminal acts of third parties. *Id.* This Court stated that, "[o]rdinarily, merchants do not have a duty to provide security guards to protect customers from the criminal acts of third parties." *Id.* at 400, citing *Williams, supra* at 504. However, this Court also noted that "invitors have a duty to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties." *MacDonald, supra* at 400, citing *Mason v Royal Dequindre, Inc,* 455 Mich 391, 405; 566 NW2d 199 (1997). This Court, in reversing the trial court's grant of summary disposition in favor of

the defendant in *MacDonald*, found that there was a genuine issue of material fact regarding whether the sod throwing that (somewhat indirectly) resulted in injury to the plaintiff was foreseeable:

> Here, in response to defendant's motion for summary disposition, plaintiff submitted evidence that there had been incidents of sod throwing at previous concerts and that defendant was aware of those incidents. Plaintiff also presented evidence that defendant had formulated policies to deal with sod-throwing incidents before the PlanetFest concert.[13] Accordingly, at the very least, a genuine issue of material fact existed with respect to whether the sod-throwing incident was foreseeable. [*Id.*]

*MacDonald* involved criminal acts that were highly peculiar to defendant's outdoor amphitheater and that the defendant in that case arguably had specific reason to anticipate. In contrast, the tragic shooting underlying the case here was, in essence, a random street crime, as was that at issue in *Scott, supra.* The finding of a genuine issue of material fact in *MacDonald* was predicated on the defendant's knowledge of a problem peculiar to its location, not a generalized social problem such as street crime. Thus, we conclude that *MacDonald* is materially distinguishable in

---

[13] We find the consideration in *MacDonald* of the defendant having formulated policies to deal with sod-throwing incidents to be questionable. In *Buczkowski, supra* at 99, n 1, the Michigan Supreme Court stated:

> Imposition of a legal duty on a retailer on the basis of its internal policies is actually contrary to public policy. Such a rule would encourage retailers to abandon all policies enacted for the protection of others in an effort to avoid future liability.

Similar concerns are implicated by consideration of the internal policies of the operator of an indoor or outdoor place of entertainment. Nevertheless, because *MacDonald* is not controlling in the case at hand, we need not consider whether *MacDonald* was correctly decided.

light of its peculiar facts and does not alter our conclusion that a merchant is ordinarily not liable for a criminal act committed against an invitee in a parking lot owned, controlled, or otherwise used by the merchant. Indeed, in *Mason, supra* at 401, the Michigan Supreme Court stated:

> We found [in *Williams, supra* at 501-502], as a matter of public policy, that a merchant cannot control crime in the community. It is unreasonable to expect a merchant to provide police protection, a duty vested in the government.

Michigan law does not treat essentially random "crime in the community," such as the tragedy underlying this case, as a "foreseeable" harm against which a merchant must insure its patrons. Thus, the trial court properly granted summary disposition in favor of Tri-County.

### F. CONCLUSION

The central issue in this case relates to duty.[14] Plaintiff essentially invites us to find that Baldini, Inc., had a duty to Steven G. Krass and that Tri-County derived a duty to him on the basis of the contract between Baldini, Inc., and Tri-County. We decline the

---

[14] Plaintiff repeatedly attempts to posit the central issue as related to the negligent performance by Tri-County's security guard of a voluntarily assumed duty, pointing out that the security guard was not wearing a uniform, that the security guard was sitting in an unmarked car, that the security car had no flashing light on top, and that the security guard was not watching the patrons get out of their cars but was instead reading a book or a magazine. Plaintiff then asserts, correctly, that the question whether a security guard was negligent in the performance of his duty is a question of fact for the jury. We simply note, however, that the question of the *existence* of a duty is one of law, to be decided by the trial court in the first instance. We hold that the trial court correctly decided this issue when it granted Tri-County summary disposition pursuant to MCR 2.116(C)(10).

invitation. As did the Supreme Court in *Williams*, we find that the duty advanced by plaintiff is essentially one of police protection,[15] but that duty is vested in the government by constitution and statute. As in *Williams*, we further find that although a property owner can control the condition of its premises by correcting physical defects that may result in injuries to its business invitees, it cannot control the incidence of crime in the community and that the inability of government and law enforcement officials to prevent criminal attacks does not justify transferring the responsibility to a business owner or, derivatively, to the security company that the business owner hires.

As was the case in *Scott*, here the plaintiff is attempting to avoid the central holding in *Williams* that merchants are ordinarily not responsible for the criminal acts of third persons by invoking the principle that a person can be held liable for improperly discharging a voluntarily undertaken function. As did the Court in *Scott*, we hold that a merchant, and the security company it hires, who voluntarily take safety precautions related to the general threat of crime cannot be sued on the theory that the safety precautions were less effective than they could or should have been.

Affirmed.

O'CONNELL, J., concurred.

HOLBROOK, JR., P.J., I concur in the result only.

---

[15] We repeat our observation that the duties actually contained in the contract fall considerably short of police protection.